The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 19, 2018

**2018COA53**

**No. 15CA0121, People v. Bryant — Evidence — Opinions and Expert Testimony — Testimony by Experts**

A division of the court of appeals considers whether a police officer's testimony defining a street slang term for an illegal drug constitutes lay or expert testimony under the test set forth in *Venalonzo v. People*, 2017 CO 9. The division concludes that the testimony in this case was expert testimony.

When, as in this case, there is testimony defining a term that is not likely to be known by someone with ordinary experiences and knowledge, the testimony is expert testimony. Under the circumstances here, the division concludes that the police officer's testimony defining the term "sherm" as "PCP" constituted expert testimony and was, thus, inadmissible.

Although the trial court erred by improperly admitting the police officer's testimony as lay testimony, the division further concludes that the error was harmless.

The division also considers and rejects defendant's arguments that his statements to police were involuntary, that his *Miranda* waiver was invalid, and that the trial court improperly instructed the jury.

Accordingly, the division affirms the judgment of conviction.

COLORADO COURT OF APPEALS                                    **2018COA53**

Court of Appeals No. 15CA0121
Arapahoe County District Court No. 14CR874
Honorable Elizabeth A. Weishaupl, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Durron Larry Bryant,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by CHIEF JUDGE LOEB
Davidson* and Márquez*, JJ., concur

Announced April 19, 2018

Cynthia H. Coffman, Attorney General, Christine Brady, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Jeffrey Svehla, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2017.

¶ 1     Defendant, Durron Larry Bryant, appeals the judgment of conviction entered on jury verdicts finding him guilty of unlawful possession of a controlled substance and two counts of third degree assault.  We affirm.

I.     Background and Procedural History

¶ 2     According to the prosecution's evidence, in the late afternoon on April 4, 2014, a woman called the police because she had seen Bryant jumping up and down, cursing, and screaming near an intersection in Aurora.  Officers arrived just after Bryant struck a male teenager in the back of the head and hit a female teenager on the side of her face.  After arresting Bryant, officers interviewed eyewitnesses and conducted a field showup.  The witnesses identified Bryant as the man who had been acting erratically and as the man involved in the altercation, and Officers Ortiz and Fink transported Bryant to the Aurora jail.

¶ 3     Shortly after arriving at the jail, and approximately one hour after Bryant was arrested, Officers Ortiz and Fink interviewed Bryant in the booking room.  Officer Ortiz read Bryant his rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  He then asked Bryant if he understood his rights, and Bryant said that he did.

1

Officer Ortiz asked Bryant if he would be willing to speak with police, and Bryant said that he was willing to do so.

¶ 4     During the interview, Officer Ortiz asked Bryant if he was under the influence of drugs or alcohol, and Bryant answered that he was. When Officer Ortiz asked Bryant what substance he was under the influence of, Bryant said that the substance was in his sock and pointed to his ankle, telling the officers that they could retrieve the substance. After the officers retrieved a small vial from Bryant's sock, Officer Ortiz asked Bryant what the substance was. Bryant responded that the substance was "sherm."

¶ 5     Officer Ortiz was not familiar with the term "sherm," but Officer Fink recognized it as a term meaning "PCP" or phencyclidine. Officer Fink asked Bryant several times during the interview if the substance was "PCP," and Bryant eventually responded that the substance was "PCP." At trial, Officers Ortiz and Fink testified to this exchange, and Officer Fink also testified that, based on his training and experience, he knew that "sherm" is a street slang word for "PCP."

¶ 6     Bryant was charged with unlawful possession of a controlled substance and two counts of third degree assault.

¶ 7     Before trial, Bryant submitted several motions to suppress, and the court held a two-day suppression hearing.  As relevant here, Bryant contended that his statements to police were involuntary and that his *Miranda* waiver was invalid.  Officers Ortiz and Fink both testified at the suppression hearing, as did the two teenagers who were assaulted and a witness to the assault.  The trial court denied all of Bryant's motions to suppress, ruling that Bryant's statements were made voluntarily and that he had validly waived his *Miranda* rights.

¶ 8     A jury convicted Bryant as charged, and he now appeals.

## II.     Suppression

¶ 9     Bryant contends that the trial court erred by ruling that his statements to the police were voluntary and that he had validly waived his *Miranda* rights.  We are not persuaded.

### A.     Facts

¶ 10    The following facts were established at the suppression hearing through testimony from Officers Ortiz and Fink.

¶ 11    On the day of Bryant's arrest, Officers Ortiz and Fink were originally dispatched to Bryant's location to conduct a welfare check on a man who was acting erratically in the middle of the street and

who was possibly under the influence of drugs. While Officers Ortiz and Fink were on the way to Bryant's location, however, they received a further dispatch that the same individual who had been acting erratically had possibly threatened and assaulted people at the scene.

¶ 12    Upon arriving at the scene, Officers Ortiz and Fink saw a man who matched the description given in the dispatch and who was later identified as Bryant. They proceeded to approach Bryant, and Officer Ortiz ordered Bryant to stop and speak with him. In response, Bryant looked at Officers Ortiz and Fink and then began to walk away. Officers Ortiz and Fink continued to approach Bryant, and Officer Ortiz ordered Bryant to stop, turn around, and interlock his fingers. Officer Ortiz gave Bryant several orders to do this, but Bryant did not comply. Instead, Bryant put his hands up and then down in response to Officer Ortiz's commands, and then he got down on the ground before standing back up. Finally, a third officer on the scene ordered Bryant to sit back down on the ground.

¶ 13    Officers Ortiz and Fink both testified that this was unusual behavior and that Bryant did not seem to understand Officer Ortiz's

4

commands. After arresting Bryant, they proceeded to interview witnesses and conduct a field showup.

¶ 14 While Officers Ortiz and Fink were transporting Bryant to the Aurora jail, Bryant repeatedly asked why he had been arrested, and Officer Ortiz repeatedly explained to Bryant that he had assaulted someone. Officer Ortiz described Bryant as acting in disbelief each time he explained to him that he had assaulted someone. Officer Ortiz also testified that Bryant asked why he had been arrested approximately fifteen to twenty times, while Officer Fink estimated that Bryant asked this question approximately five times.

¶ 15 Officer Ortiz further testified that he believed Bryant was under the influence of drugs or alcohol because of his behavior; Officer Fink testified that Bryant seemed to be coming off of a high. Officers Ortiz and Fink both testified that Bryant's demeanor changed, however, by the time they arrived at the jail, and they both described him as being calm and cooperative at the jail.

¶ 16 Officers Ortiz and Fink brought Bryant to a booking room where Officer Ortiz read Bryant his *Miranda* rights from a pre-prepared card issued by the Aurora Police Department, and Bryant orally waived those rights. During the course of the interview,

5

Bryant admitted that he was under the influence of drugs, revealed to Officers Ortiz and Fink that he had a small vial of drugs in his sock, and identified the vial as containing "sherm," which he later admitted during the interview meant "PCP." According to the officers' testimony, neither of them threatened or coerced Bryant in any way, nor did they use physical force on Bryant.

### B. Voluntariness

¶ 17　Bryant contends that his statements to the police at the jail were involuntary and should have been suppressed, arguing that the police exploited his intoxicated state during their interrogation to elicit incriminating responses. We disagree.

### 1. Standard of Review and Applicable Law

¶ 18　When a trial court rules on a motion to suppress, it engages in both factfinding and law application. *People v. Platt*, 81 P.3d 1060, 1065 (Colo. 2004). We will uphold a trial court's findings of fact on the voluntariness of a statement when the findings are supported by adequate evidence in the record, but we review de novo a trial court's ultimate determination of whether a statement was voluntary. *Effland v. People*, 240 P.3d 868, 878 (Colo. 2010).

¶ 19     When reviewing a trial court's suppression ruling, appellate courts must only consider evidence presented at the suppression hearing. *Moody v. People*, 159 P.3d 611, 614 (Colo. 2007). We consider the "interrelationship between the evidentiary facts of record, the findings of the trial court, and the applicable legal standards." *People v. D.F.*, 933 P.2d 9, 13 (Colo. 1997). We also examine a trial court's legal conclusions de novo under the totality of the circumstances. *People v. Triplett*, 2016 COA 87, ¶ 28.

¶ 20     When a defendant seeks to suppress a confession or inculpatory statement, the prosecution must establish by a preponderance of the evidence that the confession or statement was voluntary. *People v. Gennings*, 808 P.2d 839, 843 (Colo. 1991). Under the Due Process Clauses of the United States and Colorado Constitutions, a defendant's statements must be made voluntarily in order to be admissible into evidence. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25; *Mincey v. Arizona*, 437 U.S. 385, 397 (1978); *People v. Raffaelli*, 647 P.2d 230, 234 (Colo. 1982).

¶ 21     A statement is voluntary made if it is "not 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight.'" *People v. Mounts*, 784 P.2d 792, 796

(Colo. 1990) (quoting *People v. Pineda*, 182 Colo. 385, 387, 513 P.2d 452, 453 (1973)). The statement must be the product of an essentially free and unconstrained choice by the maker. *Id.*

¶ 22    "Critical to any finding of involuntariness is the existence of coercive governmental conduct, either physical or mental, that plays a significant role in inducing a confession or an inculpatory statement." *People v. Valdez*, 969 P.2d 208, 211 (Colo. 1998). "While a defendant's mental condition, by itself and apart from its relationship to official coercion, does not resolve the issue of constitutional voluntariness, the deliberate exploitation of a person's weakness by psychological intimidation can under some circumstances constitute a form of governmental coercion that renders a statement involuntary." *Gennings*, 808 P.2d at 844 (citation omitted).

¶ 23    "[I]ntoxication alone does not automatically render statements involuntary . . . ." *People v. Martin*, 30 P.3d 758, 760 (Colo. App. 2000). Rather, coercive government conduct is the "necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

¶ 24     The voluntariness of a statement must be determined by a

consideration of the totality of the circumstances under which the

statement was made.  *Mounts*, 784 P.2d at 796.  Our supreme court

has articulated several factors to consider when evaluating the

voluntariness of a statement in light of the totality of the

circumstances, including

> whether the defendant was in custody or was
> free to leave and was aware of his situation;
> whether *Miranda* warnings were given prior to
> any interrogation and whether the defendant
> understood and waived his *Miranda* rights;
> whether the challenged statement was made
> during the course of an interrogation or
> instead was volunteered; whether any overt or
> implied threat or promise was directed to the
> defendant; the method and style employed by
> the interrogator in questioning the defendant
> and the length and place of the interrogation;
> and the defendant's mental and physical
> condition immediately prior to and during the
> interrogation, as well as his educational
> background, employment status, and prior
> experience with law enforcement and the
> criminal justice system.

*Valdez*, 969 P.2d at 211 (quoting *Gennings*, 808 P.2d at 844).

## 2.     Analysis

¶ 25     We reject Bryant's contention that his statements were

involuntary.

9

¶ 26     After hearing testimony at the suppression hearing, the trial

court made an extensive and thorough oral ruling as to whether,

under the totality of the circumstances, Bryant's statements to the

police had been the product of any coercive government conduct.

In doing so, the court considered Officer Ortiz's and Officer Fink's

testimony and outlined a number of factors relevant to its analysis.

The trial court found that

> [Bryant] was in custody at the time that he
> made the statements at the station, that he
> was aware of his situation.  He'd asked why he
> was being taken to the station and he was
> being booked.  *Miranda* warnings were given
> prior to the interrogation.  Both officers
> indicated that based on their observations of
> the defendant he understood what they were
> saying and responded appropriately to the
> questions, and in fact, I find that he did
> understand and waive his rights.  He at no
> time indicated that he wanted to confer with
> counsel.  The statements were made during
> interrogation . . . .  The length . . . of the
> interrogation was short.  No threats, either
> overt or implied, were made or directed
> towards the defendant.  The defendant seemed
> to be coherent and calm and responding
> appropriately to the questions of the
> police . . . .  [U]nder the totality of the
> circumstances, I find nothing that would
> render [Bryant's] statements a product of
> undue influence, coercion, threat or in any
> way involuntary, so I deny the motion to

suppress the statements as involuntary as well.

¶ 27    We conclude that the following evidence, elicited at the suppression hearing, supports the trial court's findings regarding the voluntariness of Bryant's statements to police at the police station:

- Bryant was given *Miranda* warnings prior to the interrogation, and he understood and waived his rights.

- The interrogation lasted at most fifteen minutes.

- The interrogation occurred approximately one hour after Officers Ortiz and Fink arrested Bryant, and Bryant's demeanor had changed during that time. Once at the jail, Bryant was calm, coherent, and cooperative. He was less repetitive than when he was in the car, and he answered questions appropriately.

- There was no evidence of promises, threats, or physical or emotional coercion.

¶ 28    Accordingly, we agree with the trial court that there was "nothing that would render [Bryant's] statements a product of undue influence, coercion, threat or in any way involuntary."

11

¶ 29    Bryant's reliance on *People v. Humphrey*, 132 P.3d 352 (Colo. 2006), is misplaced.  In *Humphrey*, the trial court ruled that some of the defendant's statements were involuntary due to psychological coercion.  The defendant in *Humphrey* was a teenager suspected of stabbing another teenager and who was found "bleeding, incoherent, and in need of medical attention."  *Id.* at 354.  She was transported to the hospital, where her blood alcohol level was measured as 0.104 at 3:24 a.m., and 0.090 at 4:27 a.m.  *Id.* Nonetheless, her physician noted that she was "clinically sober" at the time of her release, and she was questioned by police at approximately 6 a.m.  *Id.*

¶ 30    The trial court in *Humphrey* "considered [the defendant's] physical, emotional, and psychological state at the time of the interrogation but recognized that, alone, these circumstances did not render her statements involuntary."  *Id.* at 361.  Rather, the trial court's finding of psychological coercion "rested upon the circumstances of a discrete portion of the interview," when she was informed that the victim had died of his stab wounds and she proceeded to have an emotional breakdown.  *Id.*

¶ 31 The supreme court in *Humphrey* affirmed the trial court's suppression of the defendant's statements made *after* being informed of the victim's death, but reversed as to the suppression of her statements made before that disclosure. *Id.* The supreme court concluded that it was only at the point that the defendant experienced an emotional breakdown, when she "cried and broke into uncontrollable sobbing" and "[h]er answers to the questions thereafter were emotional reactions that were only partially coherent," that the continued police questioning became coercive. *Id.*

¶ 32 By contrast, Bryant suffered no such emotional breakdown, but was instead described by Officers Ortiz and Fink as being calm, coherent, and cooperative. Moreover, the interview lasted no more than fifteen minutes, and there was no evidence in the record from the suppression hearing that Bryant's demeanor changed at any point during the interview itself, and no evidence of any psychological coercion like that found in *Humphrey*.

¶ 33 In sum, we conclude that the trial court did not err by finding that Bryant's statements to the police were made voluntarily.

## C. Waiver of *Miranda* Rights

¶ 34   Bryant also contends that his statements to the police should have been suppressed because the police failed to obtain a valid *Miranda* waiver.  He argues that he was so intoxicated and confused at the time he was advised of his *Miranda* rights that he did not make a knowing and intelligent waiver of those rights.  We are not persuaded.

### 1. Standard of Review and Applicable Law

¶ 35   In reviewing a trial court's ruling on a motion to suppress a custodial statement and the validity of a *Miranda* waiver, we defer to the trial court's findings of fact if they are supported by competent evidence in the record, but review the application of the law to those facts de novo.  *Platt*, 81 P.3d at 1065.  We are limited in our review to the evidence presented at the suppression hearing, and examine the trial court's legal conclusions under the totality of the circumstances.  *Moody*, 159 P.3d at 614; *Triplett*, ¶ 28.

¶ 36   Police must give a suspect a *Miranda* advisement at the outset of custodial interrogation.  384 U.S. at 444.  This advisement serves to inform a suspect of his or her constitutional rights.  *Id.*  Upon receiving a proper advisement, a suspect may waive those rights,

14

but, to be valid, the waiver must be voluntary, knowing, and intelligent. *Id.*

¶ 37  "A *Miranda* waiver is considered voluntary unless 'coercive governmental conduct — whether physical or psychological — played a significant role in inducing the defendant to make the confession or statement.'" *Platt*, 81 P.3d at 1065 (quoting *People v. May*, 859 P.2d 879, 883 (Colo. 1993)).  A person makes a knowing and intelligent waiver of his or her *Miranda* rights when he or she has full awareness of the nature of the rights being abandoned and the consequences of their abandonment.  *May*, 859 P.2d at 883.

¶ 38  "'Intoxication will render a suspect's waiver involuntary when government conduct causes the intoxication' or, if self-induced, when 'the suspect was so intoxicated that he or she could not have made a knowing and intelligent waiver.'" *People v. Clayton*, 207 P.3d 831, 836 (Colo. 2009) (quoting *Platt*, 81 P.3d at 1066).  Whether a suspect's mental faculties were diminished due to self-induced intoxication, however, is not decisive of whether a *Miranda* waiver was knowing and intelligent.  *Platt*, 81 P.3d at 1066.  Rather, intoxication only invalidates an otherwise valid *Miranda* waiver if the court finds by a preponderance of the evidence that the

defendant was so intoxicated as to be incapable of understanding the nature of his or her rights and the ramifications of waiving them. *Id.*

¶ 39    When determining whether self-induced intoxication renders a waiver unknowing or unintelligent, we consider several factors:

> whether the defendant seemed oriented to his or her surroundings and situation; whether the defendant's answers were responsive and appeared to be the product of a rational thought process; whether the defendant was able to appreciate the seriousness of his or her predicament, including the possibility of being incarcerated; whether the defendant had the foresight to attempt to deceive the police in hopes of avoiding prosecution; whether the defendant expressed remorse for his or her actions; and whether the defendant expressly stated that he or she understood their rights.

*Id.*[1]

### 2.    Analysis

¶ 40    We reject Bryant's contention that his Miranda waiver was not knowing and intelligent. Although he argues that he was so

---

[1] We recognize that many of these factors are also relevant in a review of whether a defendant's statements were voluntary. Here, the trial court properly conducted two separate reviews, one for voluntariness and one for a valid *Miranda* waiver, and applied the correct test in each.

intoxicated and confused that he could not have been fully aware of the nature of the rights he was waiving and the consequences of his decision to waive them, the record supports the trial court's finding that he was not intoxicated at the time he waived his *Miranda* rights.

¶ 41     In particular, the trial court found that Bryant was "responding appropriately to booking questions," and that he was "calm, coherent, and responding to questions appropriately and was not behaving in any way that would indicate that he was under the influence of anything, although both of [the officers] thought he might have been under the influence previously." Moreover, the trial court found that "[h]e did not indicate any confusion nor did his behavior indicate that there was any confusion or that he was suffering from any sort of impairment, which would render his waiver of his *Miranda* rights invalid."

¶ 42     Officers Ortiz's and Fink's testimony from the suppression hearing supports the trial court's findings, and no evidence was presented at the hearing to contradict their testimony. In particular their testimony revealed the following:

- Approximately one hour had passed between the time Bryant was arrested and when he arrived at the jail for questioning.

- Bryant was oriented to his surroundings and situation once he arrived at the jail.

- Bryant was cooperative, and his answers were responsive and appeared to be the product of a rational thought process.

- Bryant demonstrated that he appreciated the severity of his predicament, including the possibility of being incarcerated, when he asked whether possession of "PCP" was a felony.

- Bryant expressly stated that he understood his rights.

*See Platt*, 81 P.3d at 1066 (outlining factors to be considered when considering how intoxication might affect a knowing and intelligent *Miranda* waiver).

¶ 43    While the record shows that Bryant was incapable of following instructions when he was arrested and that he was generally confused as to the nature of his predicament while being transported to the jail, Officers Ortiz and Fink both testified that

18

Bryant's condition and demeanor had changed by the time he arrived at the jail, approximately one hour from the time they arrested him.

¶ 44     In that regard, while Officer Ortiz testified that he thought Bryant was under the influence of drugs when they arrested him, he also testified that

> [Bryant's] demeanor seemed to change from our initial contact to when we were at the jail. Also from as confused as he sounded in the car, at the jail he seemed to kind of soak it all in and was just more quiet and calm and less repetitive of his questions and answers.

¶ 45     Officer Fink testified that even before they arrived at the jail, Bryant appeared to already be on the "down side of his [being] under the influence" and was "on basically the sobriety part of using something."

¶ 46     Bryant argues, nonetheless, that his case is akin to *People v. Fordyce*, 200 Colo. 153, 612 P.2d 1131 (1980), where the supreme court affirmed the trial court's finding that the defendant's mental state was sufficiently impaired due to morphine for her *Miranda*

waiver to have been involuntary.[2]  The facts of *Fordyce*, however, are easily distinguished from the facts of the present case.

¶ 47     In *Fordyce*, the defendant was suffering from second and first degree burns, was hospitalized and on morphine, and was questioned while in the intensive care unit by detectives wearing surgical garb.  *Id.* at 155, 612 P.2d at 1132.  The defendant's treating doctor and nurse testified at the suppression hearing that the defendant's behavior appeared rational and that she seemed to be oriented as to person, time, and place.  *Id.* at 155, 612 P.2d at 1133.  Also at the suppression hearing, one of the detectives testified that the defendant was responsive and seemed to understand his questions.  *Id.*

¶ 48     The defendant in *Fordyce*, however, presented expert testimony at the suppression hearing from a toxicologist who testified that the defendant's medical records "showed an average

---

[2] *Fordyce* refers to the voluntariness of the suspect's *Miranda* waiver, but, as discussed in *People v. May*, 859 P.2d 879, 882-83 (Colo. 1993), the voluntariness standard has since been more clearly defined as comprising two separate dimensions: "first is the presence or absence of coercion, which primarily concerns the effect of police conduct, and the second is the knowing and intelligent action on the part of the person being interrogated."  *Id.* at 883.

reaction to an average dose of morphine"; that morphine "creates a euphoria which takes away a patient's perception of pain"; and that "a patient may exhibit no outward signs of intoxication," but morphine nonetheless "takes away a patient's perception of danger, thereby lessening self-protective instincts." *Id.* The expert in *Fordyce* also testified at the hearing that morphine interferes with short-term memory, and that the average person on morphine would easily confuse a detective wearing surgical garb with medical personnel. *Id.* at 156, 612 P.2d at 1133.

¶ 49    The supreme court thus explained summarily that "[t]he toxicologist's opinion based on reasonable medical probability was that an average person under treatment with morphine would have difficulty understanding a *Miranda* advisement and perceiving the important effect of information given to the police." *Id.* Concluding that "the testimony of the treating doctor, nurse and detective that the defendant's behavior appeared rational [did] not conflict with the toxicologist's testimony describing morphine intoxication," the supreme court affirmed the trial court's finding that the defendant's *Miranda* waiver was not voluntary. *Id.* at 157, 612 P.2d at 1134.

¶ 50 Here, Bryant argues that his *Miranda* waiver was invalid because it was not made knowingly and intelligently. He does not argue that his waiver was involuntary. Nonetheless, his reliance on *Fordyce* is misplaced.

¶ 51 Unlike in *Fordyce*, there was no evidence adduced at the suppression hearing, expert or otherwise, to support Bryant's contention that, despite testimony from Officers Ortiz and Fink to the contrary, he was sufficiently intoxicated to be incapable of giving a knowing and intelligent waiver of his *Miranda* rights. Indeed, the only evidence presented at the suppression hearing regarding Bryant's intoxication was in relation to his behavior at the time of his arrest and during the drive to the jail. As discussed above, however, Officers Ortiz and Fink both testified that Bryant's demeanor changed between that time and when he was given his *Miranda* advisement.

¶ 52 Accordingly, we defer to the trial court's findings as supported by the record and conclude that the court did not err by finding that Bryant validly waived his *Miranda* rights.

### III. Expert Police Testimony

¶ 53    Bryant contends that the trial court reversibly erred by allowing Officer Fink to testify as a lay witness regarding the meaning of the term "sherm." He argues that Officer Fink's testimony constituted expert opinion testimony under CRE 702, and that it was, therefore, improperly admitted under the guise of lay opinion testimony under CRE 701. Bryant further argues that this alleged error is reversible because Officer Fink's testimony that "sherm" was street slang for "PCP" was key testimony to prove that he knowingly possessed a controlled substance.

¶ 54    We agree with Bryant that Officer Fink's testimony constituted expert opinion testimony. However, we conclude that the trial court's error in admitting his testimony was harmless.

#### A.    Standard of Review and Applicable Law

¶ 55    We review a trial court's evidentiary rulings for an abuse of discretion. *Venalonzo v. People*, 2017 CO 9, ¶ 15. The trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it applies the incorrect legal standard. *People v. Russell*, 2014 COA 21M, ¶ 22, *aff'd*, 2017 CO 3.

¶ 56    In this instance, whether the trial court abused its discretion turns on whether Officer Fink's testimony was improper under CRE 701, which governs the admission of opinion testimony by a lay witness. Under CRE 701, a lay witness' testimony is limited to "opinions or inferences" that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [CRE] 702."

¶ 57    CRE 702 governs the admission of expert opinion testimony and states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

¶ 58    In determining whether testimony constitutes lay opinion testimony under CRE 701 or expert opinion testimony under CRE 702, a court must look to the basis for the witness' opinion. *Venalonzo,* ¶ 22. In particular, a court must look to "the nature of the experiences that could form the opinion's basis" rather than

24

simply asking whether a witness draws on his or her personal experiences to inform the testimony. *Id.*; *see People v. Veren*, 140 P.3d 131, 137 (Colo. App. 2005).

¶ 59    In making that determination, a court should consider "whether ordinary citizens can be expected to have known the information or have had the experiences that form the basis of the opinion." *People v. Ramos*, 2012 COA 191, ¶ 13, *aff'd*, 2017 CO 6. "If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony." *Venalonzo*, ¶ 23.  Expert testimony, by contrast, goes beyond the realm of common experience.  "If . . . the witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony." *Id.*

¶ 60    Police officers may testify as lay witnesses "based on their perceptions and experiences," *People v. Stewart*, 55 P.3d 107, 123 (Colo. 2002), but "[w]here an officer's testimony is based not only on his or her perceptions, observations, and experiences, but also on the officer's specialized training or education, the officer must be

properly qualified as an expert before offering testimony that amounts to expert testimony." *Veren*, 140 P.3d at 137.

¶ 61 Where, as here, the issue is preserved and nonconstitutional, we will review any error for harmless error. *Venalonzo*, ¶ 48. We will only reverse under a harmless error review if the error "affects the substantial rights of the parties." *Hagos v. People*, 2012 CO 63, ¶ 12. An error affects a party's substantial rights when it "substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

### B. Analysis

#### 1. Lay or Expert Testimony

¶ 62 First, for the reasons below, we conclude that Officer Fink's testimony as to the meaning of the term "sherm" was expert opinion testimony, improperly admitted as lay testimony under CRE 701.

¶ 63 Bryant objected to Officer Fink's testimony on the meaning of the slang term "sherm" at trial, and the court overruled his objection. This testimony relied on Officer Fink's specialized training and experience as a police officer who had worked for fourteen years as an officer at both the Aurora Police Department

and the Los Angeles Police Department. Accordingly, he should have been disclosed and qualified as an expert witness, and it was error to admit his testimony under the guise of lay opinion.

¶ 64    A hallmark of expert testimony by law enforcement officers is that an officer testifies as to his extensive experience in the field. So are the prosecutor advising the court that the witness is testifying based on his training and experience, and the officer testifying not based on personal knowledge or investigation of the case. *See Ramos*, ¶ 18.

¶ 65    Here, the prosecutor prefaced his inquiry of Officer Fink with questions expressly related to his training and experience, and he emphasized that his testimony was based on that training and experience:

> Q Okay.  *Now, Officer Fink, you've indicated you have been an officer for approximately nine years; is that correct?*
> A 15 total – or 14 total.
> Q Nine years with the Aurora Police Department?
> A Yes.
> Q *And you had prior law enforcement experience before coming to Aurora?*
> A Yes, sir.
> Q Where was that at?
> A Los Angeles Police Department.

Q Now, Officer Fink, have you heard the term "sherm" before?
A Yes, sir.
Q Okay. Have you heard the term "sherm" related in the context to drugs?
A Yes.
Q Okay. Where have you heard this term before?
A *Through my training and experience.* "Sherm" is the street slang for PCP.
Q *So through your experience*, you've heard "sherm" being used as, I guess, a lay term for the drug PCP?
A Yes.

(Emphasis added.)

¶ 66    Moreover, Officer Fink's testimony that "sherm" is street slang for "PCP" was not based on his personal knowledge or investigation of Bryant's case, but was instead based on his training and experience as a police officer. We find it instructive that Officer Ortiz, who was a new officer in the field training program, did not know that "sherm" meant "PCP," but his training officer (Officer Fink) did know the meaning of that term based on his own specialized training and experiences.

¶ 67    Expert testimony, by definition, "goes beyond the realm of common experience and requires experience, skills, or knowledge that the ordinary person would not have." *Venalonzo*, ¶ 22. In our

28

view, an ordinary person would not have the experience, skills, or knowledge to be able to define "sherm" as meaning "PCP."

¶ 68 Contrary to the People's argument, it is not enough that the ordinary person would be familiar with the concept of slang words, or that the ordinary person would know that slang terms exist for drugs. Rather, the key to Officer Fink's testimony, which rendered it expert in nature, was that he was able to identify a particular slang term not used in the common vernacular as meaning a particular drug.

¶ 69 We are aware of only one Colorado appellate opinion that has discussed the meaning of street slang terms. In *People v. Glover*, 2015 COA 16, a detective testified as to the meaning of several terms of street slang. In that case, however, the terms at issue were used on Facebook and did not involve the names of any illegal substances. Instead, the detective in *Glover* explained that "'fam' meant the street family, 'wea at' meant 'we are at,' 'he bitched out' meant that the person ran away, and 'we still havin 5' was a reference to a meeting somewhere to talk." ¶ 46. The division in *Glover* reasoned that the meaning of these slang terms could be determined "'from a process of reasoning familiar in everyday life,'

29

rather than 'a process of reasoning which can be mastered only by specialists in the field.'" ¶ 53 (quoting *People v. Rincon,* 140 P.3d 976, 983 (Colo. App. 2005)).[3]

¶ 70    As more recently clarified by our supreme court in *Venalonzo,* however, the test for whether testimony is expert or lay rests on the "nature of the experiences that could form the opinion's basis" rather than the "process of reasoning." ¶ 22. The terms discussed in *Glover* closely resemble the words they stand for, are phonetically indicative of the meaning, or are otherwise used frequently enough in the common vernacular so that their meaning would be evident to someone with ordinary experiences and knowledge. By contrast, the word "sherm" is not a word that is likely to be known by someone with ordinary experiences and knowledge.

¶ 71    To be sure, there are some drug-related slang terms that an ordinary person would know because those terms have entered the common vernacular through music, television, radio, film, etc. Terms such as "pot" or "crack" would be recognized and identified

---

[3] When discussing "a process of reasoning which can be mastered only by specialists in the field," *People v. Rincon* relied in part on the advisory committee note to Fed. R. Evid. 701. 140 P.3d 976, 982-83 (Colo. App. 2005).

30

based on an ordinary person's everyday experiences and knowledge. *See State v. Hyman*, 168 A.3d 1194, 1204 (N.J. Super. Ct. App. Div. 2017) ("Some [drug culture slang or code] words may have entered the popular lexicon as a result of music, film, and other aspects of modern culture, obviating the need for opinion testimony.").

¶ 72 "Sherm," on the other hand, falls into the category of drug-related slang that has yet to enter the common vernacular and would only be known by someone with intimate knowledge of drug culture or who has participated in the drug trade. Thus, Officer Fink's definition of "sherm" at trial fell squarely into the realm of expert testimony.

¶ 73 We note that other jurisdictions have likewise determined that the act of defining drug-related slang is expert rather than lay testimony. *See United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011) (ruling that an FBI agent's testimony at trial defining drug-related slang constituted expert testimony); *Hyman*, 168 A.3d at 1208 (ruling that a detective's testimony at trial defining drug-related slang and code words constituted expert testimony); *see also United States v. Garcia*, 291 F.3d 127, 139 n.9 (2d Cir. 2002) ("If [a drug dealer] offered his opinion on the allegedly coded conversation

and [the defendant's] knowledge based on his 'past experiences in drug dealing,' his opinion was not based on his perception of the situation as a participant in it" and therefore constituted expert testimony.); *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001) (noting that law enforcement officers are often qualified as experts to interpret intercepted conversations using slang, street language, and the jargon of the illegal drug trade).

## 2.    Harmless Error

¶ 74    However, while we conclude that the trial court erred in allowing Officer Fink to testify as a lay witness as to the meaning of "sherm," we also conclude that the error was harmless. *See People v. Froehler*, 2015 COA 102, ¶ 38.

¶ 75    Bryant argues that Officer Fink's testimony that "sherm" means "PCP" was key testimony relied upon by the prosecution to prove that Bryant *knowingly* possessed a controlled substance. A review of the record, however, suggests otherwise.

¶ 76    The question before us is whether the erroneous admission of Officer Fink's testimony at trial that "'[s]herm' is the street slang for PCP" was harmless. Contrary to Bryant's arguments, we fail to see how this testimony could have been a key factor in establishing

32

Bryant's knowledge that the substance he possessed was "PCP."
*See, e.g., id.* at ¶ 40 (noting that evidence about computer software used to search the defendant's home computers had no direct bearing on whether the defendant "knowingly possessed" child pornography on a flash drive).

¶ 77    At best, Officer Fink's testimony was cumulative of other evidence presented at trial that served to prove the "knowingly" element of the possession charge, *see id.* at ¶¶ 41-42, including the fact that Bryant admitted during interrogation that the substance he volunteered to Officers Ortiz and Fink, and which he initially identified as "sherm," was "PCP," and that a chemical analysis conducted on that same substance proved that the substance was indeed "PCP."

¶ 78    Officer Fink's testimony is therefore easily distinguished from testimony whose admission was deemed not harmless in other cases. In *Veren,* two officers gave lay opinion testimony "that possession of large amounts of pseudoephedrine in combination with the other chemicals and supplies found in defendant's truck indicated an intent to manufacture methamphetamine." 140 P.3d at 139. A division of this court determined that "the two officers

were essentially allowed to give expert testimony under the guise of lay opinions," and that such testimony was key testimony proving that "the items found in defendant's truck were precursors and materials used in the manufacture of methamphetamine." *Id.* at 140. Because the challenged evidence in that case was not cumulative of other properly admitted evidence, the division concluded that admission of the officers' opinion testimony was not harmless. *Id.*

¶ 79 We are likewise unpersuaded by Bryant's conclusory argument that the erroneous admission of Officer Fink's testimony prevented him from presenting his own expert witness to rebut Officer Fink's testimony. We fail to see, and Bryant has not identified, what kind of expert testimony could have been offered to rebut the simple definition by Officer Fink that "sherm" is "PCP," and we also do not perceive how any potential rebuttal could have negated the evidence otherwise properly admitted that Bryant knowingly possessed "PCP." *See Froehler*, ¶ 43.

¶ 80 Additionally, we note that the majority of Officer Fink's testimony was proper under CRE 701 as lay opinion testimony,

including his observations and inferences about Bryant's behavior prior to his arrest and during the interrogation.

¶ 81 Considering all of the above, we conclude that Officer Fink's testimony that "sherm" means "PCP" did not have a substantial influence on the verdict or impair the fairness of the trial. Accordingly, the error was harmless and thus not reversible. *See Stewart,* 55 P.3d at 124 ("A ruling admitting or excluding evidence is not reversible unless the ruling affects a substantial right of the party against whom the ruling is made."); *Froehler,* ¶ 44.

## IV. Jury Instructions

¶ 82 Bryant contends that the trial court erred by instructing the jury that voluntary intoxication was an invalid defense to the charged crimes, arguing that the instruction was superfluous and unrelated to the issues in controversy. He also contends that the trial court erred by rejecting his tendered mens rea jury instruction, arguing that the instruction given instead did not provide the jury with the full and accurate definition of what the prosecutor had to prove relating to culpable mental state. Finally, Bryant contends that these errors, both individually and cumulatively, mandate reversal. We disagree.

### A. Standard of Review and Applicable Law

¶ 83    A trial court has a duty to correctly instruct the jury on the governing law, properly, plainly, and accurately, but it has broad discretion over the form and style of the instructions so long as they are correct statements of the law. *People v. Pahl*, 169 P.3d 169, 183 (Colo. App. 2006). "The trial court should instruct the jury on a principle of law when there is some evidence to support the instruction." *People v. Montoya*, 928 P.2d 781, 783 (Colo. App. 1996). A trial court should not, however, instruct the jury on an abstract principle of law unrelated to the issues in controversy. *Id.* at 784.

¶ 84    "While the court is duty-bound to instruct the jury, 'it is equally the duty of counsel to assist the court by objection to erroneous instructions, and by the tender of instructions covering matters omitted by the court.'" *Stewart*, 55 P.3d at 120 (quoting *Fresquez v. People*, 178 Colo. 220, 232, 497 P.2d 1246, 1252 (Colo. 1972)).

¶ 85    We review jury instructions de novo to determine whether they accurately informed the jury of the governing law, but we review questions of form and style for an abuse of discretion. *Townsend v.*

*People*, 252 P.3d 1108, 1111 (Colo. 2011).  Whether additional jury instructions may be given is also a matter committed to the sound discretion of the trial court.  *People v. Burke*, 937 P.2d 886, 890 (Colo. App. 1996).  If the instructions, taken as a whole, properly instructed the jury on the governing law, there is no error.  *People v. Merklin*, 80 P.3d 921, 926 (Colo. App. 2003).

¶ 86    Under Colorado law, we often find no error, or no reversible error, where a trial court gave a superfluous instruction to the jury.  *See, e.g.*, *People v. Weeks*, 2015 COA 77, ¶ 59 (not plain error to include superfluous elements in instruction); *People v. Ujaama*, 2012 COA 36, ¶ 50 (not plain error to include superfluous instructions); *People v. Manzanares*, 942 P.2d 1235, 1241-42 (Colo. App. 1996) (error was harmless where superfluous instruction given); *People v. Baca*, 852 P.2d 1302, 1306 (Colo. App. 1992) (inclusion of an unnecessary instruction was not reversible error); *Kaesik v. John E. Mitchell Co.*, 30 Colo. App. 227, 231, 492 P.2d 871, 873 (1971) (not error to give superfluous instruction), *aff'd*, 181 Colo. 19, 506 P.2d 362 (1973) (per curiam).

¶ 87    Instructional error occurs where an instruction misleads or confuses the jury.  *Williams v. Chrysler Ins. Co.*, 928 P.2d 1375,

1377 (Colo. App. 1996). "But, language in a jury instruction cannot be a ground for reversal unless it prejudices a party's substantial rights." *Id.* at 1378.

### B.  Analysis

#### 1.  Intoxication Instruction

¶ 88    At trial, the prosecutor requested a four-paragraph jury instruction explaining that voluntary intoxication was not a valid defense to any of the charged crimes.  Bryant objected to the entirety of the requested instruction, but stated that if the trial court was inclined to give an instruction on the invalidity of such a defense, the instruction should be limited to the first two sentences of the prosecution's tendered instruction.

¶ 89    The trial court overruled Bryant's objection, but limited the instruction to the jury, using only the first two sentences of the prosecution's instruction, which stated, "Voluntary Intoxication is not a defense to the charge of Possession of a Scheduled [sic] I/II Controlled Substance.  Voluntary Intoxication is not a defense to the charge of Assault in the Third Degree."

¶ 90    Although Bryant did not argue a defense based on voluntary intoxication, he did base his defense on the theory that he did not

possess the requisite culpable mental state to commit the charged crimes, in large part because of his intoxication. Indeed, Bryant repeatedly argued at trial that he was intoxicated at the time of his arrest, and thus was incapable of forming the requisite mental state to be guilty of knowingly possessing a controlled substance and assaulting two individuals.

¶ 91 Under these circumstances, we conclude that the instruction that voluntary intoxication was not a valid defense to the charged crimes did not constitute error. In all likelihood, the instruction served to *prevent* any confusion for the jury in its determination of whether Bryant possessed the culpable mental state required for a guilty verdict. Accordingly, the instruction did not contain "abstract legal principles unrelated to the issues in controversy." *Montoya*, 928 P.2d at 784.

¶ 92 Thus, we conclude that the inclusion of this instruction, even if superfluous, could not have confused the jury, especially because it was very brief and contained a correct statement of the law. *See, e.g., Kaesik*, 30 Colo. App. 231, 492 P.2d at 873.

¶ 93 Accordingly, under these circumstances, the inclusion of this instruction did not amount to error, let alone reversible error.

## 2.    Mens Rea Instruction

¶ 94    At trial, Bryant also argued that the jury should consider his education and cognitive impairments, or lack of impairments, when determining whether he possessed the requisite mental state to commit the charged crimes.  He therefore asked the trial court to use the following mens rea instruction, taken from *People v. Heywood*, 2014 COA 99, ¶ 18, which quotes *Oram v. People*, 255 P.3d 1032, 1038 (Colo. 2011):

> The mental state of "knowingly" is a subjective, rather than an objective, standard and does not include a reasonable care standard. Therefore, circumstances where a defendant may reasonably be aware that his conduct is of such a nature or that such circumstances exist are insufficient to fulfill the knowingly mental state.

¶ 95    The prosecutor objected to Bryant's tendered mens rea instruction, arguing that it was confusing and that the trial court had already provided a proper instruction on culpable mental state. Additionally, the prosecutor argued that the tendered instruction was contrary to the law on voluntary intoxication, citing *Hendershott v. People*, 653 P.2d 385 (Colo. 1982).

40

¶ 96    The pattern instruction on mens rea given at trial stated, as

relevant here, as follows:

> A person acts "knowingly" with respect to
> conduct or to a circumstance described by a
> statute defining an offense when *he* is aware
> that *his* conduct is of such nature or that such
> a circumstance exists.  A person acts
> "knowingly" with respect to a result of *his*
> conduct when *he* is aware that *his* conduct is
> practically certain to cause the result.

(Emphasis added.)

¶ 97    On appeal, Bryant contends that the pattern instruction "did

not give the jury a full and accurate definition of what the

prosecutor must prove relating to [Bryant's] culpable mental state,"

arguing that the instruction did not accurately inform the jury that

"knowingly" is a subjective standard.  To the extent that Bryant

argues that the pattern instruction is legally inaccurate, however,

we disagree.

¶ 98    By its plain language, the pattern instruction clearly directs

the jury to apply a subjective test, stating that a person acts

"knowingly" only "when *he* is aware that *his* conduct is of such

nature of that such a circumstance exists" or "when *he* is aware

that *his* conduct is practically certain to cause the result."

41

(Emphasis added.) The instruction thus plainly directed the jurors to consider whether Bryant acted knowingly, and in no way suggested that they should apply an objective or reasonable person test.

¶ 99 Bryant points to language from *Heywood* and *Oram* in arguing that his tendered instruction should have been used instead of the applicable pattern instruction, but neither of those cases discusses the mental state of "knowingly" in terms of how a trial court should instruct a jury, and neither case required that its language be used when instructing future juries. Rather, it is well established that "[a] district court has substantial discretion in formulating the jury instructions, so long as they are correct statements of the law and fairly and adequately cover the issues presented." *People v. Romero*, 197 P.3d 302, 309 (Colo. App. 2008).

¶ 100 Here, the instruction given by the court was legally correct and adequately informed the jury to apply a subjective standard rather than an objective standard. Accordingly, the trial court did not err by providing the applicable mens rea pattern instruction, nor did it err by denying Bryant's tendered instruction. *See People v. Inman,* 950 P.2d 640, 645 (Colo. App. 1997) ("[A] trial court may properly

42

refuse an instruction which merely restates points already encompassed in other instructions given to the jury . . . .").

¶ 101 Because we conclude that there was no error in the manner in which the trial court instructed the jury, we necessarily reject Bryant's contention that reversal is mandated based on cumulative error.

## V.    Conclusion

¶ 102 The judgment is affirmed.

JUDGE DAVIDSON and JUDGE MÁRQUEZ concur.