22CA1356 Peo v Martin 05-29-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1356
City and County of Denver District Court No. 20CR5453
Honorable Ericka F. H. Englert, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Master Titus Martin,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division A
Opinion by CHIEF JUDGE ROMÁN
Martinez* and Taubman*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 29, 2025

Philip J. Weiser, Attorney General, Majid Yazdi, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Mallika L. Magner, Office of Alternate Defense Counsel, Crested Butte, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendant, Master Titus Martin, appeals the judgment of conviction entered on jury verdicts finding him guilty of one count of first degree assault causing serious bodily injury with a deadly weapon and three counts of attempted first degree extreme indifference murder.  We affirm.

## I.     Background

¶ 2     The following evidence was presented at trial.

¶ 3     On July 5, 2020, Teaja Thompson drove her black car to a gas station.  In the car with Thompson were her child, Greg Williams, and cousins Jaquane and Donzell Cooper.  Jaquane was affiliated with a gang.

¶ 4     Also stopped at the gas station were Kendeja Hughes, her boyfriend, Jerelle Smith, in the front seat of her silver car, and Martin in the rear passenger side seat.  Smith and Martin were both associated with gangs that rivaled Jaquane's.  Smith had no shirt on, and Martin was wearing a red sweatshirt.

¶ 5     As Jaquane and Donzell Cooper were walking by Hughes' car to go inside the store, they had a verbal exchange with Smith.  According to Thompson, Jaquane made a derogatory remark to Smith, insulted his gang colors, and flashed his gun at Martin.

¶ 6    Thompson's vehicle left the gas station and was driven to a nearby food stand.  At Martin's instruction, Hughes followed Thompson's car.

¶ 7    As Thompson and the Coopers walked to the food stand, they saw Hughes' car pass them.  Martin yelled out the window from the rear passenger side seat, "When I double back, you better duck" or "you better move."  Martin then instructed Hughes "to go in a circle and . . . come back around."

¶ 8    When Hughes drove past Thompson and the Coopers at the food stand a second time, Hughes heard gunshots.  She testified that she turned around and saw Martin, wearing a red hoodie "with his arm out of the . . . back window . . . holding his gun," pointing it "[t]owards the food stand."

¶ 9    Thompson, too, testified that, as she was waiting at the food stand, she saw Martin, who was in the back seat with the window rolled down, fire "eight or nine or less" shots.

¶ 10    Jaquane was hit by a bullet and suffered a broken arm. Thompson drove him to a hospital for treatment.

¶ 11    During a recorded hospital interview, Jaquane and Thompson claimed they did not recognize the shooter and did not mention the

2

earlier encounter at the gas station. But outside the hospital, Thompson told the police that Martin was the shooter. In an interview conducted at the crime scene two days later, Thompson elaborated, detailing what had happened, including the gas station encounter, and she again identified Martin as the shooter. That same day, in three photo line-ups, Thompson identified the three occupants of Hughes' car, with Martin as the shooter. However, three to four months before trial Thompson told the district attorney's office that she did not see the gun and could not identify the shooter. At trial, she testified that she had said this out of fear of gang retaliation.

¶ 12      Hughes was arrested and charged with multiple counts. She identified Martin as the shooter in a police interview and pled guilty to accessory to murder in exchange for the dismissal of her remaining counts and for the prosecution's agreement to ask for leniency in her sentencing, on the condition that she testify truthfully at Martin's trial.

¶ 13      At trial, Thompson and Hughes both testified that Martin was the shooter.

¶ 14    Several other eyewitnesses testified at trial as to their recollections of what occurred. One witness testified that she saw an "African American male" with "an Afro-style haircut" wearing a black sweatshirt shoot a gun from the back passenger window.

¶ 15    Another witness testified that the shooter was sitting in the rear passenger side seat, had "dreadlocks," and was wearing "a red hoodie."

¶ 16    A defense witness testified that the shooter was seated in the front passenger seat and was a "dark-skinned" man "wearing a red hoodie."

¶ 17    Another defense witness was not sure if the shooter was in the front or back seat of the passenger side. He acknowledged, however, that he had previously told a defense investigator that he saw the shooter in the front seat of the car.

¶ 18    Martin was convicted of one count of first degree assault causing serious bodily injury with a deadly weapon and three counts of attempted first degree extreme indifference murder. The trial court imposed a sixty-year controlling sentence in the custody of the Department of Corrections.

¶ 19    On appeal, Martin argues that the trial court abused its discretion by precluding certain photographic evidence and by admitting evidence of a Facebook Messenger exchange.

## II.    Exclusion of Photographic Evidence

¶ 20    Martin contends that the trial court abused its discretion by precluding photographic evidence that Smith owned a gun with distinctive characteristics similar to those of the gun Martin carried because trial witnesses presented conflicting evidence as to which of the two men was the shooter.  Because any probative value of the photos was substantially outweighed by the danger of unfair prejudice under CRE 403, we disagree.

### A.    Additional Background

¶ 21    On direct examination, Hughes testified that after hearing shots fired, she looked behind her and saw Martin "with his arm out of the . . . back window . . . holding his gun," which was "black and silver."

¶ 22    On cross-examination, Hughes agreed that the gun was a "Glock handgun with a silver slide, black receiver, and an attached flashlight."  Defense counsel then asked Hughes, "Smith was also known to carry a gun, correct?"

¶ 23    The prosecutor objected, expressing concern that defense counsel intended to show a photograph of Smith holding a firearm. The prosecutor "assume[d] the Defense will say it's similar to the description of the firearm in this case." Defense counsel confirmed he intended to introduce photos of Smith holding a gun for that purpose. The photos show Smith menacingly pointing a gun at the camera.

¶ 24    The prosecutor asserted that the photographic evidence had very limited probative value under CRE 403 because there was no evidence when they were taken in relation to the offense. The prosecutor also argued that admission of the photographs violated CRE 403 because they were "inflammatory," since they showed Smith pointing a gun at the camera. The prosecutor further stated that the photographs violated CRE 404 because they were being offered just to show propensity — "that this individual has possessed a gun at another time, so, therefore, it's more likely he possessed it and shot in this case."

¶ 25    Defense counsel showed the photos to the trial court. Counsel pointed out "the uniqueness of the gun" because it had a "flashlight on the bottom." Counsel argued that the photos went to identity

6

because witnesses had presented conflicting testimony regarding where the shooter was sitting in the car and some evidence that the gun used had a flashlight.

¶ 26     There was dispute as to whether there had been testimony that the gun Martin used had a flashlight.

¶ 27     The trial court ruled as follows:

> I'm going to sustain the objection.  The evidence is not admissible under Rule 404.  The Court finds that it would — the purpose of the evidence would be to demonstrate that Mr. Smith acted in conformity on July 5th with his conduct here in the photograph of holding a gun and pointing it at the camera.
>
> There's been insufficient evidence that the photograph is in any way connected to the July 5th incident, that the weapon, in particular, is in any way connected to the July 5th incident.  The Court finds pursuant to — also pursuant to Rule 403, that the evidence would be more prejudicial than probative and would cause undue confusion of the issues to the jurors.
>
> I'm going to sustain the objection.  And so Defendant's Exhibits E and F are inadmissible.
>
> Of course, if other evidence — if the evidence changes in such a way to make this evidence — I'm just going to leave it at that.  If I need to reconsider my ruling, I'll leave it to you to raise that issue based on any change in evidence.

> But as the evidence stands right now, these two exhibits are inadmissible.

### B.  Applicable Law and Standard of Review

¶ 28    CRE 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."  Rule 403 "strongly favors admissibility of relevant evidence." *People v. Vanderpauye*, 2023 CO 42, ¶ 59 (citation omitted).  Therefore, when considering the balancing required by Rule 403, "we give the evidence the maximum probative value attributable to it by a reasonable factfinder and the minimum unfair prejudice that may be reasonably expected from it." *Id.*  Unfair prejudice "refers to an undue tendency on the part of admissible evidence to suggest to the jury an improper basis for its decision." *People v. Nuanez*, 973 P.2d 1260, 1263 (Colo. 1999).  We must review the evidence "in the context of the entire record" to determine whether it adversely affected the opposing party's position "by injecting considerations which were extraneous to the merits of the lawsuit, such as the jury's bias, sympathy, anger, or shock." *Id.*

¶ 29    We review a trial court's evidentiary ruling for an abuse of discretion, meaning we will not disturb the ruling unless it is contrary to law or manifestly arbitrary, unreasonable, or unfair. *See People v. Dominguez*, 2019 COA 78, ¶ 13; *see also People v. Dist. Court of El Paso Cnty.*, 869 P.2d 1281, 1285 (Colo. 1994) ("Under CRE 403, the [trial] court is accorded considerable discretion in balancing the probative value of the evidence against the danger of unfair prejudice.").

## C.    Application

¶ 30    As an initial matter, we agree with Martin that the photographs do not fall under CRE 404(b) because they are not an "other crime, wrong, or act." Rule 404(b) "prevents the use of other crimes, wrongs, or acts to prove the character of a person in order to show he acted in conformity therewith." *People v. Greenlee*, 200 P.3d 363, 368 (Colo. 2009), *abrogated on other grounds by Rojas v. People*, 2022 CO 8. But the photos "are not character evidence because their relevance does not depend on an impermissible inference about [Smith's] character," and they "are not conduct, do not amount to a crime, and do not reveal prior bad acts." *Id.* Therefore, Rule 404(b) is inapplicable. *See id.*

9

¶ 31    However, we agree with the trial court that the photographic evidence possessed minimum probative value and was outweighed by the danger of unfair prejudice under CRE 403.  First, the photographic evidence possessed minimum probative value.  Although the jury may have inferred from the photographs that if Smith carried a gun similar to the one used in the shooting, it is more probable that he was the shooter, this probative value is significantly lessened by the fact that it was not clear when the photos were taken, and there was limited testimony about what the shooter's gun looked like.  Accordingly, we agree with the trial court that the evidence had little probative value.

¶ 32    Moreover, balancing the photographs' probative value against the possibility of unfair prejudice, we further conclude that the danger of unfair prejudice was substantially high.  The photos depicted Smith in a threatening stance pointing a gun directly at the camera.  Were the photos shown to the jury, Smith would have appeared to be pointing the gun at the jurors.  Such a threatening pose could well arouse the emotions of the jurors and have a tendency "to suggest to the jury an improper basis for its decision." *Nuanez*, 973 P.2d at 1263.

¶ 33    Moreover, while the trial court sustained the objection to the question asked by defense counsel — "Smith was also known to carry a gun, correct?" — and did not allow the photographs to be introduced into evidence, it gave the defense the opportunity to present additional evidence that might have necessitated a reconsideration of the court's ruling (for instance, a less threatening photograph or testimony that Smith carried a similar gun).  But defense counsel did not pursue the issue further.

¶ 34    For these reasons, we conclude the trial court correctly balanced the limited probative value of the photos against the high danger of unfair prejudice, and excluded them.  Therefore, we conclude that the trial court's decision not to admit the photographs of Smith pointing a gun at the camera was not an abuse of discretion.

### III.    Admission of Facebook Messages

¶ 35    Martin also contends that the trial court abused its discretion when it admitted irrelevant, unduly prejudicial hearsay evidence of a purported Facebook Messenger exchange, without proper authentication or foundation.  Again, we disagree.

11

## A. Additional Background

¶ 36    Thompson testified that in the year before the trial, she was contacted by individuals she believed were associated with Martin and received Facebook messages she believed were related to this case. The prosecutor showed her an exhibit containing messages in which the sender alleged she was a "snitch" and blamed her for Martin's incarceration. Thompson said she had received the messages through Facebook and agreed that the exhibit was "an accurate copy of at least some of the messages [she] received from the individual alleging [she was] a snitch."

¶ 37    Defense counsel objected, asserting a "lack of foundation as to who they were from." The trial court overruled the objection and admitted the exhibit.

¶ 38    Thompson testified that the messages were from Martin's close friend whom she knew from high school. She also testified that she understood some of the messages as "threatening violence" to her and her unborn child as retaliation for "being a snitch." Thompson further testified that around the time the messages were sent, she believed Martin knew where she was staying and that she was being watched. Thompson eventually relocated out of state.

12

## B.     Standards of Review and Reversal

¶ 39     We review evidentiary rulings, including hearsay, foundation, and authentication rulings for an abuse of discretion.  *Nicholls v. People*, 2017 CO 71, ¶ 17; *People v. Bernard*, 2013 COA 79, ¶ 8.

¶ 40     The parties disagree whether Martin preserved his foundational argument for appeal but agree that his remaining contentions are unpreserved.  We need not address preservation, however, because we discern no error, let alone plain error.

## C.     Hearsay

¶ 41     Evidence is hearsay if it is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  CRE 801(c).  "If a statement is hearsay, it is inadmissible unless it falls within an exception to the hearsay rule."  *People v. Glover*, 2015 COA 16, ¶ 37 (quoting *People v. Welsh*, 176 P.3d 781, 790 (Colo. App. 2007)). As applicable here, "if an out-of-court statement is offered solely to show its effect on the listener, it is not being offered to prove the truth of the matter asserted and is not hearsay."  *Brown*, ¶ 58.

¶ 42     Here, the Facebook messages were not offered to show the truth of the "matter asserted" — that is, that Thompson was a

snitch and was to blame for Martin's incarceration. Instead, they were offered to show the effect that such comments had on Thompson. Specifically, they were offered to show that she changed her story regarding the shooter multiple times due to her fear of gang retaliation.

¶ 43 Thus, the trial court did not err by not excluding the Facebook messages on hearsay grounds.

### D. Foundation and Authentication

¶ 44 Authentication is a condition precedent to admissibility of evidence. CRE 901(a). This requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* The burden to authenticate is not high — only a prima facie showing is required. *Gonzales v. People*, 2020 CO 71, ¶ 42. "[A] '[trial] court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic.'" *Glover*, ¶ 13 (quoting *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014)).

¶ 45 "A proponent of evidence may establish the authenticity of evidence in numerous ways." *Id.* at ¶ 14. For instance, the

14

proponent may establish authenticity by a witness with knowledge. *See* CRE 901(b)(1).

> Facebook records are analogous to phone records or emails. In Colorado, e-mails may be authenticated under either CRE 901(b)(1), through testimony of a witness with knowledge that a matter is what it is claimed to be, or CRE 901(b)(4), through consideration of distinctive characteristics shown by an examination of their contents and substance in light of the circumstances of the case.

*Glover*, ¶ 24.

¶ 46    Here, the Facebook messages were authenticated under CRE 901(b)(1) when Thompson testified that the exhibit was "an accurate copy" of the Facebook messages she had received from Martin's friend. Martin's reliance on *Glover* for the proposition that more was required to authenticate the messages is misplaced. The *Glover* division held that "[t]o properly authenticate the printouts, the prosecution had to make two separate showings: (1) the records were those of Facebook and (2) the communications recorded therein were made by defendant." *Id.* The division's concern about the authenticity of the Facebook messages included showing who sent them because they were allegedly sent by the defendant. *See id.* at ¶¶ 29-30. But here, the sender of the messages was not the

15

issue; rather, the issue was the content of the messages and their effect on Thompson; therefore, *Glover* is inapplicable.

¶ 47     To the extent that the evidence showed the Facebook messages were sent by Martin's friend, any error in the admission of the Facebook messages was harmless because it was cumulative of other evidence suggesting Thompson was pressured by Martin not to testify. *See People v. Bryant*, 2018 COA 53, ¶ 77 (the erroneous admission of evidence was harmless because it was cumulative of other evidence that was admitted at trial). Specifically, there was evidence that Martin knew where she lived and that she thought she was being followed. Also, there was evidence that Martin's mother and sister contacted Thompson by phone multiple times during the week before trial to tell Thompson what she "should" and "shouldn't say" in court. They told Thompson to "plead the Fifth" and to say she was being "intimidated by officers," which Thompson understood as asking her not to testify against Martin.

¶ 48     For these reasons, we conclude that the trial court did not err by not sua sponte excluding the Facebook messages on foundation or authentication grounds.

## E.    Relevance

¶ 49    CRE 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Unless otherwise provided by constitution, statute, or rule, all relevant evidence is admissible. CRE 402.  Relevant evidence may be excluded if it has an "undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror."  *Masters v. People*, 58 P.3d 979, 1001 (Colo. 2002) (quoting *People v. Dist. Ct.*, 785 P.2d 141, 147 (Colo. 1990)).

¶ 50    Within broad limits, evidence tending to show bias or prejudice, or to shed light on the inclinations of witnesses, may be admissible.  *People v. Taylor*, 545 P.2d 703, 705 (Colo. 1976). "Thus, evidence of a witness's fear of retaliation is admissible to explain his or her change in statement or reluctance to testify." *People v. Villalobos*, 159 P.3d 624, 630 (Colo. App. 2006); *see also People v. Burgener*, 62 P.3d 1, 28 (Cal. 2003) ("Evidence that a witness is afraid to testify or fears retaliation for testifying is

17

relevant to the credibility of that witness and is therefore admissible.").

¶ 51 Martin contends that "the effect on Thompson, as the listener, of being called a snitch by [his] 'street sister' . . . had no bearing on his guilt, and thus no relevance" and that "[i]t was immaterial to [his] guilt whether or not another person had caused Thompson to be in fear." But the Facebook messages make more probable that Thompson was threatened for testifying against Martin and that she was therefore motivated to change her testimony. *See Villalobos*, 159 P.3d at 630. The evidence thus went directly to Thompson's credibility. *See Burgener*, 62 P.3d at 28.

¶ 52 We therefore conclude that the trial court did not err by not sua sponte excluding the Facebook messages on relevance grounds.

## IV. Disposition

¶ 53 The judgment of conviction is affirmed.

Justice MARTINEZ and Judge TAUBMAN concur.