22CA1854 Peo v Martin 02-19-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1854
El Paso County District Court No. 21CR1268
Honorable Catherine Mitchell Helton, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Demetrius Montez Martin,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE WELLING
Taubman*, J., concurs
Berger*, J., concurs in part and dissents in part

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 19, 2026

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver,
Colorado, for Plaintiff-Appellee

Eric A. Samler, Alternate Defense Counsel, Hollis A. Whitson, Alternate
Defense Counsel, Denver, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Defendant, Demetrius Montez Martin, appeals his judgment of conviction for first degree murder (extreme indifference), second degree murder, attempted first degree murder (extreme indifference), illegal discharge of a firearm, and possession of a weapon by a previous offender (POWPO).  Because we agree with Martin's contention that he was entitled to receive a self-defense jury instruction on multiple assailants or apparent necessity, we reverse Martin's judgment of conviction for first degree murder (extreme indifference), attempted first degree murder (extreme indifference), second degree murder, and illegal discharge of a firearm and remand for a new trial on these charges.  We, however, affirm his POWPO conviction.

## I.     Background

¶ 2     Early one morning, Martin was outside an after-hours club with a group of people, including DJ Benjamin.  Martin and Benjamin began arguing in the parking lot.  At some point after the fight, Martin got in his white Range Rover and drove out of the parking lot.  No one else entered Martin's Range Rover.  As Martin was driving away, shots were fired from the parking lot.  Martin stopped his car, got out and walked approximately twenty feet from

the car, walked back to his car, retrieved a gun, and began shooting toward the parking lot. He then got back into his car and drove away.

¶ 3    When the shooting occurred, M.C. was driving away from the club because Donnel Smith, her boyfriend, had told her that a shooting was about to occur. Smith's sister, D.S., was in the car with M.C. but crouching on the floor of the backseat. M.C. was shot and killed but D.S. wasn't struck. After a bullet struck M.C., the car she was driving crashed.

¶ 4    The police never recovered a gun, and the bullets that struck M.C. were never matched to a specific gun. Police eventually arrested Martin and charged him with two counts of murder in the first degree (after deliberation and extreme indifference), attempted murder in the first degree (extreme indifference), illegal discharge of a firearm, POWPO, and two habitual criminal sentence enhancers. Before trial, the trial court bifurcated the POWPO charge from the remaining charges at Martin's request. The jury found Martin guilty of all charges — except for one count of murder in the first degree (after deliberation), where it found him guilty of the lesser included offense of second degree murder instead. The same jury

2

found Martin guilty of POWPO during the second portion of the bifurcated proceeding.

¶ 5 Martin was sentenced to a controlling sentence of life in prison without the possibility of parole for the first degree murder (extreme indifference) conviction, with his sentences for his remaining convictions running concurrently with his life sentence.

## II. Analysis

¶ 6 Martin contends that his convictions must be vacated because they weren't supported by sufficient evidence. He further contends that the trial court erred by (1) declining to include an apparent necessity or multiple assailants instruction as part of the self-defense jury instructions; (2) allowing a detective to narrate and identify him on surveillance video; (3) not granting a mistrial after mistakenly giving the jury instructions on the bifurcated POWPO charge; and (4) entering both a first degree and second degree murder conviction for M.C.'s death. We first address, and reject, Martin's sufficiency of the evidence argument. We next address Martin's contention that the trial court erred by not giving certain self-defense instructions that he was entitled to. Finally, we address Martin's argument that the court erroneously allowed a

detective to identify him on surveillance video. Because Martin's remaining contentions aren't likely to arise in the same posture on remand, we decline to address them.

### A. Sufficiency of the Evidence

¶ 7 Martin contends that the prosecution failed to introduce evidence sufficient to prove beyond a reasonable doubt that he was the person seen in the video who "fired the shots," and thus, all his convictions must be vacated. We aren't persuaded.

### 1. Standard of Review and Applicable Legal Principles

¶ 8 We review sufficiency of the evidence claims de novo. *McCoy v. People*, 2019 CO 44, ¶¶ 27, 34. In assessing whether the prosecution presented sufficient evidence to support a conviction, we consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *People v. Donald*, 2020 CO 24, ¶ 18 (quoting *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010)). In making this assessment, we "give the prosecution the benefit of all reasonable inferences that might fairly be drawn from

the evidence," *id.* at ¶ 19, so long as such inferences are supported by a "logical and convincing connection" between the inferred conclusion and the established facts. *Id.* (quoting *People v. Perez*, 2016 CO 12, ¶ 25).

### 2. Sufficient Evidence Supports the Verdict

¶ 9 Because Martin's contention focuses on whether sufficient evidence supported the conclusion that he shot M.C., we focus our analysis on evidence related to identity. After reviewing the evidence, we conclude that sufficient evidence supports the conclusion that Martin shot and killed M.C. Our conclusion is supported by the following evidence:

- Martin was at the club that night at around the time M.C. was shot.

- Witnesses testified that Martin had a dispute or argument with Benjamin before shots were fired.

- Soon after the argument, video surveillance footage showed a white Range Rover speeding away from the parking lot as shots were fired toward the car.

- The white Range Rover had distinctive features, including a black gas cap and black ventilation piece.

- Detectives later determined that Martin owned a white Range Rover with these distinctive features.

- Witnesses testified that Martin owned a white Range Rover, and at least one witness testified that he was the only person inside the white Range Rover at that time.

- After the initial shots rang out, surveillance footage showed a man exiting the white Range Rover, retrieving a gun, and shooting it in the direction of M.C.'s vehicle.

- Martin's friend testified that he thought Martin had fired the shots because there weren't many people where his car was parked.

- Within seconds of the Range Rover shooting, a loud crash could be heard on surveillance tapes.

- A crime scene investigator testified that, based on the trajectory analysis, the bullet that struck M.C. couldn't have come from the area of the parking lot where shots were initially fired.

¶ 10 Based on this evidence, a jury could reasonably conclude that, after the argument, Martin drove away from the parking lot in his Range Rover and, after shots were fired at him, he exited his car

6

and began shooting toward the parking lot. The jury could also reasonably conclude that M.C.'s car crashed after she was struck by a bullet fired by Martin.

¶ 11 Considering the evidence in the light most favorable to the People, we conclude that sufficient and substantial evidence supports the conclusion that Martin shot M.C. Accordingly, there is sufficient evidence to support his convictions.

### B. Self-Defense Jury Instructions

¶ 12 Martin next contends that the trial court erred by declining to include a multiple assailants or apparent necessity instruction in the self-defense jury instructions. We agree.

### 1. Additional Facts

¶ 13 At trial, evidence was presented that, when the shooting occurred, more than two individuals with guns posed a potential threat to whoever was driving the Range Rover.

¶ 14 With respect to the presence of multiple guns at or near the scene of the shooting, D.S. testified that after leaving the club, her brother, Donnel Smith, grabbed a gun from the center console of his car. And another witness testified that a man named "Vegas" had a gun and that he believed another man, Monta Smith, also

7

had a gun. An officer who investigated the shooting, Detective Jason Gasper, testified that he identified "Vegas" as Yannel Dixson. Further, Benjamin testified that once the gunfire started, he heard gunshots coming from "everywhere."

¶ 15    Forensic evidence found at the scene also indicated that multiple weapons had been fired that morning. Stephanie Happ, a senior firearms examiner who analyzed bullets, bullet fragments, and cartridge cases from the scene, testified that she found cartridge cases from a .45 caliber weapon and from more than one 9 mm weapon. She further testified that the damaged fragments she examined could have come from as many as five different weapons.

¶ 16    During a jury instruction conference, Martin's counsel requested an apparent necessity or multiple assailants instruction, stating that "[t]he reasonableness of the actions [is] particularly at issue in this case, and so [an apparent necessity or multiple assailants instruction] is an appropriate instruction to have."

¶ 17    The prosecutor objected, arguing that the pattern self-defense jury instruction "adequately apprises the jury it is required to consider the totality of the circumstances in evaluating the

reasonableness of the [d]efendant's belief and the necessity of the defensive action." The court then had the following colloquy with defense counsel:

> THE COURT: It's also my understanding of current case law that we have the model instructions instructing the jury as to the elements mirroring the statutes, and along with the self-defense instructions being included, that this instruction becomes an — essentially, an unnecessary instruction. [Counsel], if you have case law that suggests otherwise, I'm happy to consider it, but that is my understanding of the law. Do you have any authority that suggests otherwise?
>
> [Defense Counsel]: I don't think it's required by the Court —
>
> THE COURT: Sure.
>
> [Defense Counsel]: — but we are requesting it. I think it is an appropriate instruction on the law. Appropriate in this case, given the issues do highlight that particular issue.

¶ 18 The court denied Martin's request for the instructions.

¶ 19 The trial court gave two self-defense instructions at trial. Instruction No. 22 instructed the jury regarding an affirmative defense to the first degree murder (after deliberation) charge, illegal discharge of a firearm charge, and the lesser included offense of second degree murder. Instruction No. 23 instructed the jury on

9

self-defense as a traverse to the first degree murder (extreme indifference) charge, attempt to commit first degree murder (extreme indifference) charge, and the lesser included offenses of manslaughter and criminally negligent homicide.

¶ 20    Instruction No. 22 tracked the pattern jury instruction, COLJI-Crim. H:12 (2024), and read, in relevant part, as follows:

> The evidence presented in this case has raised the affirmative defense of "deadly physical force in defense of person," as a defense to Murder in the First Degree (After Deliberation) (Count 2) and Illegal Discharge of a Firearm (Count 4) and the lesser included offense[] of Murder in the Second Degree.
>
> The defendant was legally authorized to use deadly physical force upon another person without first retreating if:
>
> 1. he used that deadly physical force in order to defend himself from what he reasonably believed to be the use or imminent use of unlawful physical force by that other person, and
>
> 2. he reasonably believed a lesser degree of force was inadequate, and
>
> 3. he had a reasonable ground to believe, and did believe, that he was in imminent danger of being killed or of receiving great bodily injury.
>
> The prosecution has the burden to prove, beyond a reasonable doubt, that the defendant's conduct was not legally authorized

10

by this defense. In order to meet this burden of proof, the prosecution must disprove, beyond a reasonable doubt, at least one of the above numbered conditions.

¶ 21 Instruction No. 23 tracked the pattern jury instruction, COLJI-Crim. H:14, and read, in relevant part, as follows:

> The evidence presented in this case has raised the question of self-defense with respect to Murder in the First Degree (Extreme Indifference) (Count 1) and Attempt to Commit Murder in the First Degree (Count 3) and the lesser included offenses of Manslaughter and Criminally Negligent Homicide.
>
> A person is justified in using deadly physical force upon another person without first retreating in order to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person if he reasonably believes a lesser degree of force is inadequate, and he has a reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury.
>
> You have been instructed that the prosecution has the burden of proving beyond a reasonable doubt all of the elements of Murder in the First Degree (Extreme Indifference) (Count 1) and Attempt to Commit Murder in the First Degree (Count 3) and the lesser included offense[s] of Manslaughter and Criminally Negligent Homicide, including that the defendant acted with extreme indifference to the value of human life.

11

You are further instructed that, with respect to Murder in the First Degree (Extreme Indifference) (Count 1) and Attempt to Commit Murder in the First Degree (Count 3) and the lesser included offenses of Manslaughter and Criminally Negligent Homicide, the prosecution does not have an additional burden to disprove self-defense. You are instructed, though, that a person does not act with extreme indifference to the value of human life if his conduct is legally justified as set forth above.

## 2. Standard of Review

¶ 22 We review de novo "whether jury instructions adequately inform the jury of the governing law." *Garcia v. People*, 2023 CO 30, ¶ 9. But "[w]e review a trial court's decision to give, or not to give, a particular jury instruction for an abuse of discretion." *People v. Perez*, 2024 COA 94, ¶ 34. A trial court abuses its discretion if its decision "was manifestly arbitrary, unreasonable, or unfair or was based on an erroneous understanding of the law." *Id.*

¶ 23 Martin argues that the applicable standard of reversal is constitutional harmless error because the court's failure to give the requested instructions violated his constitutional due process rights. Specifically, he argues that the prosecution had a lower burden of proof because it wasn't required to prove beyond a reasonable doubt the additional element — as established by the

12

multiple assailants and apparent necessity instructions — that Martin wasn't threatened by multiple assailants. Constitutional harmless errors require reversal if "there is a reasonable *possibility* that the [error] might have contributed to the conviction." *Hagos v. People*, 2012 CO 63, ¶ 11 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). The State bears the burden of proving a constitutional error was harmless beyond a reasonable doubt. *Id.*

¶ 24 Alternatively, Martin argues that if we don't find constitutional harmless error applies, reversal is still required under the nonconstitutional harmless error standard of reversal. Under this standard, "reversal is warranted if the error affects the substantial rights of the parties, meaning 'the error substantially influenced the verdict or affected the fairness of the trial proceedings.'" *People v. Martinez*, 2020 COA 141, ¶ 28 (quoting *Zapata v. People*, 2018 CO 82, ¶ 61). "Reversal is more difficult to obtain under this standard than under the constitutional harmless error standard because this standard requires that the error impair the reliability of the judgment of conviction to a greater degree than the constitutional harmless error standard requires." *Hagos*, ¶ 12.

¶ 25    Because we conclude that reversal is required under the "more difficult to obtain" nonconstitutional harmless error standard, we decline to resolve which standard applies. *See People v. Schnorenberg*, 2025 CO 43, ¶ 51.

### 3.    Applicable Legal Principles

¶ 26    A person is entitled to use deadly physical force if that person (1) "reasonably believes a lesser degree of force is inadequate" and (2) "has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury." § 18-1-704(2)(a), C.R.S. 2025. When considering the reasonableness of a person's belief in the necessity of a "defensive action" and the reasonableness of force used when taking the defensive action, the jury should consider "the totality of circumstances, including the number of persons reasonably appearing to be threatening the accused." *People v. Jones*, 675 P.2d 9, 14 (Colo. 1984). A trial court isn't required, however, to give a specific multiple assailants instruction or an apparent necessity instruction; rather, the court need only "direct the jury to consider the totality of the circumstances during its deliberations on reasonableness." *Riley v. People*, 266 P.3d 1089, 1094 (Colo. 2011)

(noting that *Jones* doesn't require a trial court to give a specific multiple assailants instruction in *every* case involving both multiple assailants and self-defense); *see People v. Roberts-Bicking*, 2021 COA 12, ¶¶ 21, 23, 25, 28 ("[A] specific apparent necessity instruction is never required." (citing *Beckett v. People*, 800 P.2d 74, 77-78 (Colo. 1990))).

### 4. Waiver and Preservation

¶ 27 We first address the People's argument that Martin waived his contention that the trial court erred by declining to include a multiple assailants or apparent necessity instruction in the self-defense jury instructions and therefore Martin failed to preserve this contention.

¶ 28 According to the People, Martin waived his jury instruction contention because at trial he "requested the instructions without any argument on why they were appropriate" and "conceded that . . . [the trial court] was not 'required' to give [the instructions]." We disagree with the People that this constituted waiver or even failure to preserve the argument he advances on appeal.

¶ 29     "Waiver is 'the *intentional* relinquishment of a *known* right or privilege.'" *Forgette v. People*, 2023 CO 4, ¶ 28 (quoting *People v. Rediger*, 2018 CO 32, ¶ 39).  A party may waive a right or privilege explicitly through express abandonment or impliedly by "engag[ing] in conduct that manifests an intent to relinquish a right or privilege or act[ing] inconsistently with its assertion."  *Id.*

¶ 30     Here, we can't conclude that Martin explicitly or impliedly waived his right to a multiple assailants or apparent necessity instruction.  Martin, through counsel, requested the instructions and, contrary to the People's assertion, argued why he was entitled to the instruction and didn't abandon his request for the instruction.  Thus, Martin didn't waive this issue.

¶ 31     Instead, we conclude that Martin preserved this issue.  An issue is preserved for appeal if a party's actions "allow the trial court 'a meaningful chance to prevent or correct the error and create[] a record for appellate review.'"  *People v. Tardif*, 2017 COA 136, ¶ 10 (quoting *Martinez v. People*, 2015 CO 16, ¶ 14).  Martin did just this when requesting an apparent necessity or multiple assailants instruction during the jury instruction conference.  It's of no moment that defense counsel then stated that the court wasn't

16

*required* to give the instruction. What matters is that Martin brought the issue to the court's attention, allowing it to correct a potential error and to create a record for our review. Thus, we conclude that Martin preserved this issue for our review.

¶ 32    We now proceed to the merits of his contention.

        5.    Martin Was Entitled to a Multiple Assailants Instruction

¶ 33    Because evidence presented at trial supports the possibility that Martin was attacked by multiple assailants, he was entitled to a self-defense instruction on multiple assailants. And, although the court gave the jury an instruction that tracked the pattern jury instructions, it still didn't properly instruct the jury on multiple assailants. *See Garcia v. People*, 2019 CO 64, ¶ 22 (a pattern jury instruction isn't "a safe harbor that insulates instructional error from reversal").

¶ 34    Under *Jones*, a trial court is required to instruct the jury on multiple assailants in conjunction with the defendant's right to self-defense when the evidence shows the presence of more than one possible assailant. 675 P.2d at 14. But a court may accomplish this task in more than one way. The court may explicitly inform the jury that it must consider the number of people who appeared to

17

threaten the defendant. *See id.* Or the court may instruct the jury more generally on this consideration by either giving an instruction on apparent necessity, *Roberts-Bicking*, ¶ 28 (citing *Riley*, 266 P.3d at 1095), or instructing the jury "to consider the reasonableness of the defendant's beliefs and actions under the totality of the circumstances," *id.* at ¶¶ 25, 28; *see also Riley*, 266 P.3d at 1094.

¶ 35     Here, however, the trial court didn't provide the jury with any instruction consistent with any of these acceptable methods. Thus, the trial court erred.

¶ 36     The People contend that because the court instructed the jury to consider "all the evidence," it properly instructed the jury to consider the totality of the circumstances. To be sure, the court wasn't required to use specific language on multiple assailants. And, as discussed above, there are multiple ways a court can instruct the jury on multiple assailants in the self-defense context. But a separate general instruction that the jury must consider all the evidence in reaching its verdict isn't tantamount to telling the jury it must consider the totality of the circumstances when assessing the reasonableness of a defendant's actions and beliefs.

¶ 37    The People further contend that the pattern self-defense instruction logically and adequately encompasses multiple assailants principles, and thus, further instruction on multiple assailants isn't necessary.  To support this assertion, the People cite *Beckett* and the concurrence in *Riley*.  In *Beckett*, our supreme court held that a self-defense instruction tracking the text of the statute *and* informing the jury "to consider the defendant's 'reasonable belie[f]' of use or imminent use of force" encompassed the apparent necessity principle and "adequately apprised the jury that it was required to consider 'the totality of the circumstances.'" 800 P.2d at 78.  Justice Coats cited *Beckett* in his concurrence in *Riley*, stating that he "consider[s] it clear that [the supreme court's] holding in *Beckett* disavowed any obligation to supplement the statutory self-defense language with an additional instruction concerning reasonable appearances, including any specific direction with regard to the number of apparent assailants."  266 P.3d at 1096 (Coats, J., concurring in the judgment).  But Justice Coats' view of the applicability of *Beckett* didn't command a majority of the court.

¶ 38     We acknowledge that the supreme court's holding in *Beckett*

may appear to support the notion that giving the pattern jury

instructions alleviated any need for a multiple assailants

instruction.  But we agree with the division in *Roberts-Bicking* that

"absent a more explicit proclamation that *Beckett* altered the

holding of *Jones*, we assume that *Jones* — as explicitly modified by

*Riley* — remains good law to the extent it requires an explicit

instruction that the jury must consider the totality of the

circumstances."  *Roberts-Bicking*, ¶ 25.

¶ 39     The trial court, therefore, erred.  But this error only warrants

reversal if it wasn't harmless.  And here, we can't conclude that the

error was harmless.

¶ 40     With respect to Martin's illegal discharge of a firearm

conviction, self-defense was an affirmative defense that the People

had to disprove beyond a reasonable doubt.  By not including a

multiple assailants or apparent necessity instruction, the court

lowered this burden.  *See People v. Pickering*, 276 P.3d 553, 555

(Colo. 2011) ("[I]f presented evidence raises the issue of an

affirmative defense, the affirmative defense effectively becomes an

additional element, and the trial court must instruct the jury that

the prosecution bears the burden of proving beyond a reasonable doubt that the affirmative defense is inapplicable.").

¶ 41     And with respect to Martin's first degree murder (extreme indifference) and attempted first degree murder (extreme indifference) convictions, the jury was instructed that if Martin acted in self-defense, he did "not act with extreme indifference." Self-defense is not an affirmative defense to extreme indifference murder but instead is an "element-negating traverse" of the mens rea element. *Riley*, 266 P.3d at 1093; *People v. Gross*, 2012 CO 60M, ¶ 15 n.6. Because the prosecution had to prove that Martin acted with extreme indifference to convict him of these charges, the court's failure to include the multiple assailants or apparent necessity language affected the jury's ability to properly assess whether Martin committed first degree murder (extreme indifference) and attempted first degree murder (extreme indifference). Whether Martin acted with extreme indifference needed to be assessed in light of the number of potential assailants he faced.

¶ 42     Thus, we reverse Martin's convictions for first degree murder (extreme indifference), attempted first degree murder (extreme

indifference), second degree murder, and illegal discharge of a firearm. Reversal of the POWPO charge on this ground isn't required, however, because self-defense is neither an affirmative defense nor an element-negating traverse to POWPO.

## C. Detective Gasper's Testimony

¶ 43 Martin next contends that the trial court erred by permitting Detective Gasper to "narrate" and interpret surveillance footage of the shooting.[1] Specifically, Martin contends that Detective Gasper's testimony constituted "an improper lay opinion that invaded the province of the jury" because the jurors were equally capable of interpreting the surveillance footage. We aren't persuaded.

### 1. Additional Facts

¶ 44 Before trial, Martin moved to suppress his identification by Detective Gasper as unreliable and the product of undue suggestion, citing *Manson v. Brathwaite*, 432 U.S. 98 (1977), and *Bernal v. People*, 44 P.3d 184 (Colo. 2002). In the motion, Martin requested that the court suppress any out-of-court identification

---

[1] We address this issue because it implicates the POWPO charge, which isn't affected by the instructional error that we identified in Part II.B above.

procedure and not permit an in-court identification because they weren't reliable. As relevant here, at the hearing, Detective Gasper testified that he recognized Martin from occasions where Martin had come into court and from the preliminary hearing. He also testified that he had observed Martin in body camera footage in an unrelated case. The trial court denied Martin's motion to suppress and found that Detective Gasper's testimony was reliable and would be helpful to the jury pursuant to CRE 701.

¶ 45 At trial, Detective Gasper testified that during his initial investigation, he "spent many, many hours sifting through[,] essentially frame by frame[,] the different camera angles [at a] business," and that he had "reviewed them dozens and dozens more time[s] since then." Detective Gasper then testified to events seen on surveillance footage as they were being played for the jury. Detective Gasper's testimony included identification of cars seen in the video, their movement, and the individuals in the cars, what individuals in the videos appeared to be wearing, and what he believed to be muzzle flashes "based on [his] experience." Detective Gasper also explained his investigative process and how he used information from the videos to determine that Martin shot M.C.

Martin didn't contemporaneously object to this testimony during trial.

## 2. Preservation

¶ 46    The People contend that Martin failed to properly preserve the contention he advances on appeal. We agree with the People.

¶ 47    To preserve an objection to evidence admitted at trial, a party must make a "timely and specific objection." *People v. Coughlin*, 304 P.3d 575, 581-82 (Colo. App. 2011) (quoting *Am. Fam. Mut. Ins. Co. v. DeWitt*, 218 P.3d 318, 325 (Colo. 2009)). An objection allows the trial court to "focus on the issue and hopefully avoid the error." *Id.* at 582. Here, Martin filed a pretrial motion to suppress unreliable identification on the surveillance footage by Detective Gasper. The argument made in his motion, however, was that Detective Gasper's identification of Martin "led to an impermissibly suggestive identification procedure," and the requested relief was suppression of the identification pursuant to *Brathwaite* and *Bernal*. The pretrial motion didn't contain any objection to Detective Gasper narrating the video or offering lay opinion testimony describing what was depicted in the video. While Martin's motion cited to a relevant surveillance identification case,

*Robinson v. People*, 927 P.2d 381 (Colo. 1996), Martin used the case to support the argument that Detective Gasper's identification of him was unreliable and led to a suggestive identification procedure. Martin also failed to contemporaneously object to Detective Gasper's testimony on the basis of improper lay opinion testimony or improper narration and identification at trial. Thus, Martin's contention that Detective Gasper's interpretation of the surveillance video was improper isn't preserved. Accordingly, we review it for plain error. *Hagos*, ¶ 14.

3. Applicable Legal Principles and Standard of Review

¶ 48 Pursuant to CRE 701, a lay witness may testify "in the form of opinions or inferences" that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." In contrast, CRE 702 permits expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." "A witness, lay or expert, may not form conclusions for jurors that they are competent to reach on their own." *People v.*

*Vergari*, 2022 COA 95, ¶ 18 (quoting *People v. McFee*, 2016 COA 97, ¶ 76).

¶ 49 "We review a trial court's evidentiary rulings for an abuse of discretion." *People v. Abdulla*, 2020 COA 109M, ¶ 61. "A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law." *Id.*

¶ 50 When counsel fails to preserve an issue, we review for plain error. *Hagos*, ¶ 14. Plain error is error that is both obvious and substantial. *Id.* We reverse under this standard "only if the error 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *Id.* (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

### 4. Lay Opinion Testimony

¶ 51 Police officers may testify as lay witnesses if their testimony is "based on their perceptions and experiences." *People v. Grant*, 2021 COA 53, ¶ 60 (quoting *People v. Bryant*, 2018 COA 53, ¶ 60). But an officer's testimony that is also based "on the officer's specialized training or education" is considered expert testimony. *Id.* (quoting *Bryant*, ¶ 60). In this case, Detective Gasper described the cars in the video, the clothing of individuals depicted in the videos, and

26

where cars and individuals were moving. None of these observations required specialized training or education.

¶ 52 But Detective Gasper also testified that, "based on his experience," he observed muzzle flashes on the video. Whether this testimony requires specialized training or education is a closer call. Even if we assume that this was improper lay opinion testimony, this wouldn't have been obvious to the trial court. An error is obvious if it "contravenes a clear statutory command, a well-settled legal principle, or Colorado case law." *People v. Kadell*, 2017 COA 124, ¶ 25. We can't find, and the People don't cite, any authority holding that interpreting a muzzle flash on surveillance footage constitutes expert testimony. Thus, any error wasn't obvious; therefore, any error isn't reversible.

### 5. Province of the Jury

¶ 53 We next determine whether Detective Gasper's testimony invaded the province of the jury based on either improper identification or improper narration.

¶ 54 We start by addressing identification and conclude that the trial court didn't abuse its discretion by permitting any identification by Detective Gasper.

¶ 55    A lay witness may testify to "the identity of a person depicted in a surveillance photograph [or video] if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph" or video than the jury. *Robinson,* 927 P.2d at 384; *see also Grant,* ¶¶ 64, 66 (quoting and relying on *Robinson* in the context of a surveillance video). To testify as to a defendant's identity, a lay witness doesn't need to be "intimately familiar" with the defendant, and the defendant need not have changed his appearance since the photograph or video was taken. *Robinson,* 927 P.2d at 384; *Grant,* ¶ 64. But the lay witness must be personally familiar with the defendant. *Robinson,* 927 P.2d at 384; *Grant,* ¶ 64.

¶ 56    It wasn't an abuse of discretion for the trial court to permit Detective Gasper to testify about whether Martin was the shooter on the surveillance footage because he had adequate familiarity with Martin. At the pretrial hearing, Detective Gasper testified that he had seen Martin in court and had watched an unrelated body camera video of Martin. While this familiarity is far from intimate, that goes to the weight of Detective Gasper's testimony, not its admissibility. *See Robinson,* 927 P.2d at 384. Further, based on

28

his involvement in the investigation and his testimony that he had reviewed the footage "dozens" of times, Detective Gasper's testimony made it more likely that he would correctly identify Martin in the video and that his testimony would be helpful to the jury. *See Grant*, ¶ 66. Thus, the trial court didn't abuse its discretion by permitting Detective Gasper to testify about the identity of the shooter in the surveillance video.

¶ 57 Next, we address Detective Gasper's narration of the video and conclude that his narration doesn't constitute reversible error.

¶ 58 Much of Detective Gasper's testimony about the surveillance footage provided jurors with information and context that he gained from his review of the video recordings. For example, Detective Gasper's testimony informed the jury which cars belonged to the victim and Martin, the direction the victim's and Martin's cars were facing, and which streets or businesses appeared in the footage. Because this knowledge was based on Detective Gasper's investigation of the case and was information the jury wouldn't have otherwise had, he wasn't in the same position as the jurors, and it wasn't an abuse of the trial court's discretion to permit his testimony.

¶ 59　To the extent portions of his testimony consisted of pure narration, any error by the trial court in admitting the testimony isn't reversible because it didn't cast serious doubt on the reliability of the conviction. The jury was provided with the surveillance footage admitted at trial and could evaluate the footage itself and decline to accept all or part of Detective Gasper's testimony. *See McFee*, ¶ 79 ("[W]hile it was improper for the detective to state an opinion as to the words uttered by [the defendant], the jury had no reason to accept his opinion and could evaluate [the defendant's] words for itself."); *see also Vergari*, ¶ 20.

¶ 60　Thus, we discern no reversible error and decline to reverse Martin's POWPO conviction on this ground.

### D.　Remaining Contentions

¶ 61　Because Martin's remaining contentions — failure of the mittimus to reflect the merger of second degree murder into first degree murder and the erroneous inclusion of a POWPO instruction in the instructions given during the first phase of the trial — don't affect the POWPO conviction and aren't likely to arise on remand in the same posture presented here, we decline to address them.

### III. Disposition

¶ 62 We affirm Martin's POWPO conviction. But we reverse his convictions for first degree murder (extreme indifference), attempted first degree murder (extreme indifference), second degree murder, and illegal discharge of a firearm, and remand the case for a new trial on these charges.

JUDGE TAUBMAN concurs.

JUDGE BERGER concurs in part and dissents in part.

JUDGE BERGER, concurring in part and dissenting in part.

¶ 63　　This is not a self-defense case.  Therefore, I respectfully dissent from the majority's reversal of the first degree murder (extreme indifference), attempted first degree murder (extreme indifference), and illegal discharge of a firearm convictions for defendant, Demetrius Montez Martin.

¶ 64　　I reach this conclusion for two separate reasons.  First, although the facts are somewhat unclear, considering the evidence in the light most favorable to Martin, he was not entitled to a self-defense instruction.  Second, even if there was sufficient evidence to justify a self-defense instruction (which he received), there was insufficient evidence to require a multiple assailants instruction, the basis on which the majority reverses Martin's convictions.

## I.　　Facts

¶ 65　　There was a fight in the nightclub where the shooting occurred.  The club was closed and Martin and the other patrons went outside into the parking lot.  There, Martin argued with another patron.  It is unclear whether the other patron threatened Martin verbally, but for these purposes, I assume he did.  After a short time, both disputants walked away.

¶ 66    Martin then got into his car and started driving out of the parking lot. At that point, four gunshots were heard and surveillance video depicts what seem to be muzzle flashes consistent with gunfire. Instead of continuing to drive out of the parking lot, Martin stopped his car, got out, walked approximately twenty feet from the car back towards the nightclub, and then walked back to the car, retrieving a gun.

¶ 67    Martin then started shooting indiscriminately towards the nightclub and the remaining people in the parking lot, hitting and instantly killing a young woman in a different car who was trying to leave the parking lot. There was no evidence that the victim ever threatened Martin or had a gun.

II.    Martin Was Not Entitled to a Self-Defense Instruction

¶ 68    On these facts, I believe the trial court could have properly denied a self-defense instruction, which would have mooted the question of whether the jury was properly instructed on multiple assailants.

¶ 69    The People did not object to a self-defense instruction either in the trial court or in this court.[1]  Under longstanding appellate doctrine, an appellate court may affirm a judgment on any ground supported by the record, irrespective of whether that ground was relied on or even considered by the trial court.  *People v. Dyer*, 2019 COA 161, ¶ 39 (citing *People v. Aarness*, 150 P.3d 1271, 1277 (Colo. 2006)).

¶ 70    In recent years, the Colorado supreme court has applied and explained the party presentation principle: "Under our adversarial system of justice, we adhere to the party presentation principle, which relies on the parties to frame the issues to be decided and assigns to courts the role of neutral arbiters of the matters raised." *Galvan v. People*, 2020 CO 82, ¶ 45.

¶ 71    There may be some tension between the appellate doctrine that a court may affirm (but not reverse) on any ground supported

---

[1] I do not mean to criticize the People for not objecting to a self-defense instruction when, under applicable law, the threshold for a self-defense instruction is so low.  To avoid a possible appellate reversal, a prosecutor may reasonably decide not to object to a potentially inappropriate self-defense instruction and instead rely on the common sense of the jury to reject a far-fetched self-defense contention.  Trial judges may, for the same reasons, engage in a similar calculus.

by the record and the party presentation principle.  In the context of this case, however, any such tension is immaterial because the People *do* argue on appeal that any error in not instructing the jury on multiple assailants was harmless.

### III.   Any Error in Not Giving a Multiple Assailants Instruction Was Harmless

¶ 72    When an instructional error issue is preserved, we ordinarily apply the nonconstitutional harmless error standard.  *People v. Koper*, 2018 COA 137, ¶ 9.  "[R]eversal is warranted if the error affects the substantial rights of the parties, meaning 'the error substantially influenced the verdict or affected the fairness of the trial proceedings.'"  *People v. Martinez*, 2020 COA 141, ¶ 28, (quoting *Zapata v. People*, 2018 CO 82, ¶ 61).

¶ 73    Martin was convicted of extreme indifference first degree murder.  Self-defense is not an affirmative defense to the crime of extreme indifference murder.  *People v. Gross*, 2012 CO 60M, ¶ 18.  Therefore, the prosecution had no burden to disprove self-defense as to that crime.  *Id.*; *People v. Pickering*, 276 P.3d 553, 556 (Colo. 2011).  Instead, self-defense is a traverse to extreme indifference murder.  *Pickering*, 276 P.3d at 555.

¶ 74    Because self-defense was not an element of extreme indifference murder, I believe that the appropriate standard of reversal in this case is nonconstitutional harmless error. *Cf. id.* (when self-defense is an affirmative defense, a failure to properly instruct the jury on the elements of self-defense lowers the burden of proof).

¶ 75    This is especially true because Martin's attorney argued to the jury that he had acted in self-defense, a contention rejected by the jury.

¶ 76    Applying the nonconstitutional harmless error standard of reversal, I conclude that even if there was instructional error in not giving a multiple assailants instruction, the error was harmless. I agree with the People that Martin's argument that his shooting indiscriminately into the crowd was justified by self-defense defies reason.

¶ 77    Moreover, while Colorado follows the "no retreat" doctrine, meaning that a person who uses deadly physical force to protect himself or others is not required to retreat, nothing in the self-defense statute, case law, or common sense says that if a person *does* retreat, he may reengage and still claim self-defense. Martin

was already leaving the scene of the fight when he decided to stop, walk back towards the nightclub, then walk back to his car, retrieve a gun, and start shooting. This is not self-defense.

## IV. There Was Insufficient Evidence to Require a Multiple Assailants Instruction

¶ 78 I also don't see sufficient evidence to support a multiple assailants instruction. While there was some ballistics evidence regarding different types of ammunition found at the scene, no witness testified that anyone other than the person firing the four shots referred to above and Martin engaged in gunfire. Even with the very low evidentiary threshold required for self-defense instructions, I don't think Martin was entitled to a multiple assailants instruction.

¶ 79 For all these reasons, Martin's first degree murder conviction should not be reversed on the basis of the claimed instructional error.

## V. Other Claimed Errors

¶ 80 Addressing the other errors asserted by Martin, I fully join the majority's opinion rejecting his challenge to the in-court identification and "narration" of surveillance videos by the lead

detective.  I also agree that there was sufficient evidence to support his convictions.

¶ 81    As to the first issue raised by Martin that the majority does not reach — that the murder verdicts were fatally infected by the inadvertent submission of the possession of a weapon by a previous offender (POWPO) jury instructions during deliberation on the murder counts — that contention is meritless.  On inquiry by the trial court, the jury attested that it did not read or consider those instructions before it returned a verdict on the murder or illegal discharge of a firearm counts.  There is no basis to disregard the jury's response to the court's inquiry.[2]

¶ 82    Finally, as for Martin's contention that the trial court erred by failing to merge his second degree murder conviction into his first degree murder conviction, as the People correctly point out, the court did state on the record that it was merging Martin's second

---

[2] Martin was also charged and convicted of second degree murder. As to that charge, self-defense *is* an affirmative defense and thus is an element of the offense that the prosecution must disprove beyond a reasonable doubt.  *Gross*, ¶ 18.  But the second degree murder conviction merges into the first degree murder conviction so it is unnecessary to analyze whether there was constitutional harmless error with respect to the instructions on second degree murder.

degree murder conviction into his first degree murder (extreme indifference) conviction during sentencing. But the mittimus doesn't reflect this. Instead, the mittimus incorrectly states that Martin was convicted of both first degree murder charges — extreme indifference *and* after deliberation — despite being acquitted of the latter. Based on my disposition, I would remand the case with instructions that the trial court correct the mittimus to reflect that (1) Martin was acquitted of first degree murder (after deliberation) and (2) he was convicted of second degree murder but it merged into his first degree murder (extreme indifference) conviction. *See* Crim. P. 36 ("Clerical mistakes in judgments . . . may be corrected by the court at any time."); *People v. Esparza-Treto*, 282 P.3d 471, 480 (Colo. App. 2011) ("When the mittimus is incorrect, we must remand to allow the trial court to correct it.").

## VI.   Conclusion

¶ 83    For these reasons, I would affirm Martin's convictions for murder in the first degree (extreme indifference), attempted murder in the first degree (extreme indifference), illegal discharge of a firearm, and POWPO, and remand the case for correction of the mittimus.